FILED

2006 NOV 13 PM 3:42

CLERK C. Robinson
SO. DIST. OF GA.

GARY MUHS,          :          CIVIL ACTION

    Plaintiff,          :

v.          :

RIVER RATS, INC., d/b/a Two-  :
Way Marina, TWO-WAY MARINA,
TWO-WAY BOATYARD, RICK SMITH, :
and LAMAR WELCH,

                :

    Defendants.          NO. CV207-77

## O R D E R

Plaintiff, Gary Muhs, filed the above-captioned case

against Defendants, River Rats, Inc., doing business as Two-

Way Marina ("River Rats"), Two-Way Boatyard, Rick Smith, and

Lamar Welch, asserting negligence and unseaworthiness

claims.[1]

Presently before the Court are Defendants' motions for

---

[1] Muhs also brought claims against Two-Way Marina separately from the
claims asserted against River Rats. Two-Way Marina filed a motion for
summary judgment stating that it is not a distinct legal entity separate
and apart from River Rats. Muhs has not responded to Two-Way Marina's
motion, and there is no evidence that it has an independent legal
existence. Thus, Defendant "Two-Way Marina" will be dismissed from the
case. See Webb v. Phoebe Putney Mem'l Hosp., 1:05-CV-124 (WLS), 2006
U.S. Dist. LEXIS 63545, at *7 (M.D. Ga. Sept. 6, 2006); Valdosta Hotel
Props., LLC v. White, 278 Ga. App. 206, 212 (2006)(a corporation may be
sued under its official name or its trade name).
    Muhs also filed additional claims against Welch alleging breach of
contract and spoliation of the evidence, but Plaintiff has abandoned
those claims. Dkt. No. 70 at 2.

summary judgment and Plaintiff's motion to amend his complaint. Because there is some evidence that River Rats, Two-Way Boatyard, and Welch may be liable, their motions will be **DENIED** in part. Because there is no evidence that River Rats, Two-Way Boatyard, and Welch committed other acts of negligence averred by Muhs, their motions will be **GRANTED** in part. Because there is no evidence to support piercing the corporate veil, Smith's motion will be **GRANTED**. Because Muhs' motion is indefinite and vague, it will be **DENIED**.

## BACKGROUND

Viewing the facts in the light most favorable to Muhs, as the Court must on a summary judgment motion, the facts are as follows. On June 22, 2005, Muhs, his fiancée Nancy Ball, and Ball's two children, David and Jackie, traveled to Two-Way Marina, which is located near Darien, Georgia. Muhs traveled to the marina to inspect and fuel the <u>Nellie Belle</u>, a boat that Muhs was in the process of purchasing from Lamar Welch. Muhs tried to start the boat, but one of the engines would not fire. Muhs concluded that there was no gas in the boat. After some time, Muhs was able to start the boat and pulled it around to the fueling dock at the marina.

2

River Rats operates the Two-Way Marina, which is open to the public, and provides facilities to fuel watercraft. The fueling operation is self-service. Dkt. No. 62, Frances Jones Dep. 4. On June 22, 2005, River Rats' employee Frances Jones was responsible for turning the gas pump on and off. Ms. Jones never went to the fuel dock to pump fuel herself. It was Ms. Jones' normal practice to stand by the pump while the boat was fueling until it was time to turn the pump off. Id.

Once the boat was moored at the fueling dock, David had to go to the bathroom. Muhs did not want David to use the restroom in the marina's restaurant, Mudcat Charlie's, because Jackie had broken the toilet there about ten days earlier. Dkt. No. 54, Muhs Dep. 53. Instead, Muhs wanted David to go to the bathroom in the Altamaha River, and told David he would hold onto the boy the whole time. Once Muhs put David in the water, the boy got scared and wiggled out of Muhs' hands. When Ball saw that Muhs had dropped her son in the water, she became upset and started yelling at Muhs.

Around this time, Muhs talked to the fuel attendant, Jones, and Muhs started fueling the boat. Fuel is dispensed from a pump through a hose to a fuel nozzle which is inserted

3

into the vessel's fuel port attached to the gas tank. Muhs set the automatic lever to "pump," and took David to the bathroom in the restaurant. When Muhs returned, he saw and smelled gasoline in the river and in the boat's bilge, which is located below the deck with the vessel's engines. Ms. Jones did not go near the Nellie Belle at the time of fueling and did not see the boat's gas tank overflowing while the gas was being dispensed. Dkt. No. 62, Frances Jones Dep. 17.

Muhs noticed that 252 gallons of gasoline had been dispensed, and thought "it just topped out." Dkt. No. 54, Muhs Dep. 106. Ball testified that it was obvious to her and Muhs that there was gas in the bilge, and they both smelled gas. Both expressed their concern about starting the boat under these circumstances. Muhs told Ball that they needed to dilute the gasoline spilled in the boat, so they poured twenty-four bottles of water, containing twenty-four ounces of water each, into the bilge.

Muhs waited about an hour, and could no longer smell gas. Muhs believed he had eliminated the danger that the spilled gasoline might ignite. Muhs wanted to start the boat to see what was wrong with it so he could talk to Welch about the problem. The children were on the dock at this time.

4

As Muhs tried to start the engine, Jackie yelled "Daddy, Daddy, boat on fire!" Dkt. No. 54, Nancy Ball Muhs Dep. 84; Dkt. No. 93 ¶ 34. Muhs turned around and saw smoke, but not flames, coming from the engine compartment. Muhs first thought there was an electrical fire because the boat had electrical problems previously.

Muhs then saw that Ball's legs were on fire, so he pushed her into the water. Muhs went back around to the engine compartment to try to figure out what was wrong. Ball testified that Muhs stayed on the boat for several minutes after she caught fire. Dkt. No. 54, Nancy Ball Muhs Dep. 86. After Muhs looked down and saw that his arm was on fire, he dove off the boat because he thought it was going to explode. Muhs pulled himself onto the dock and collapsed at Ball's feet. Muhs was burned severely in the fire.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment

AO 72A
(Rev. 8/82)

as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor[,]" United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).

## DISCUSSION

### I. Plaintiff's Claims Against River Rats, Two-Way Boatyard, and Welch Sound in Admiralty Law

Muhs' complaint invokes the Court's diversity jurisdiction, and alternatively, the Court's admiralty jurisdiction. Muhs submits that this case arises out of a fire on a vessel upon navigable waters and is a negligence case in admiralty. River Rats responds that state law applies, not the law of the sea.

Under the "Reverse-Erie" doctrine, federal maritime law governs the rights and liabilities of the parties where a tort occurs on navigable waters, irrespective of whether the

6

case is litigated in state or federal court, even if a federal court's diversity jurisdiction is invoked by the plaintiff. Diesel "Repower," Inc. v. Islander Invs. Ltd., 271 F.3d 1318, 1322 & n.1 (11th Cir. 2001).

Federal maritime law applies where the situs and nexus tests are established. Id. at 1322 n.2 (citing Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972)). Where the "substance and consummation of the occurrence which gave rise to the cause of action" takes place in navigable waters, the situs or locality test is established. Executive Jet, 409 U.S. at 255 (quoting T. Smith & Son, Inc. v. Taylor, 276 U.S. 179, 182 (1928)). "[T]he tort 'occurs' where the alleged negligence took effect." Id. at 266. Additionally, where the underlying tort bears a substantial relationship with maritime activity, it has a sufficient connection with maritime law and the nexus test is met. Id. at 268.

In the instant case, the boat became engulfed in flames after fueling, while floating in the Altamaha River. The application of federal maritime law is supported by the facts. This is not a case like Executive Jet, where an airplane crashed fortuitously into navigable waters. Id. at 266; see also Dir. v. Perini N. River Assocs., 459 U.S. 297,

7

320 (1983). The Court concludes that the nexus test is met because the averred tort has a substantial relationship with maritime activity.

Although the law of the sea governs, a federal court sitting in admiralty may apply common-law rules where such application does not impair principles of uniformity mandated by federal maritime law. E. River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 873 (1986); Coastal Fuels Mktg., Inc. v. Fla. Express Shipping Co., 207 F.3d 1247, 1251-52 (11th Cir. 2000).

Because maritime law applies, River Rats' argument that Muhs assumed the risk of the peril, and is thus precluded from recovery, is not well founded. "Any rule of assumption of risk in admiralty, whatever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it. Under that doctrine contributory negligence, however gross, is not a bar to recovery but only mitigates damages." Edward Leasing Corp. v. Uhlig & Assocs., Inc., 785 F.2d 877, 886 (11th Cir. 1986)(quoting Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 431 (1939)).

Therefore, Muhs' alleged failure to act as a reasonable

person constitutes contributory negligence that could reduce his recovery, but not bar it outright. The Court applies comparative fault rules to apportion damages in admiralty cases according to the relative fault of the parties. E.g., Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 629 (1959).

## II. Muhs Has Not Withdrawn His Jury Trial Demand

Traditionally, there is no right to a jury trial in admiralty cases. Concordia Co. v. Panek, 115 F.3d 67, 69-73 (1st Cir. 1997). The Seventh Amendment does not mandate, or prohibit, jury trials in maritime cases. Fitzgerald v. U.S. Lines Co., 374 U.S. 16, 20 (1963).

If in an admiralty case, there is a separate and independent basis for federal jurisdiction supporting a claim for damages at law, the court must honor a demand for a jury trial. Concordia Co., 115 F.3d at 70-71; Parsell v. Shell Oil Co., 421 F. Supp. 1275, 1276 (D. Conn. 1976). This is true so long as the plaintiff does not describe his claim as an admiralty claim under Federal Rule of Civil Procedure 9(h). McCann v. Falgout Boat Co., 44 F.R.D. 34, 42-44 (S.D. Tex. 1968). Often, the cases refer to such a description as

9

a "Rule 9(h) election." See Concordia Co., 115 F.3d at 70-71; Lemon v. Bank Lines, Ltd., 411 F. Supp. 677, 678 (S.D. Ga. 1976).

A plaintiff's election to treat a claim as arising under the court's admiralty jurisdiction is procedural in nature. That is, it allows a plaintiff to select a bench trial rather than a jury trial. The election does not permit a plaintiff to choose the applicable substantive law. Carey v. Bahama Cruise Lines, 864 F.2d 201, 206 (1st Cir. 1988). If a party fails to identify the claim as one in admiralty, instead averring diversity jurisdiction, the right to a jury trial is preserved through the "saving to suitors" clause.[2] Wilmington Trust v. U.S. Dist. Ct., 934 F.2d 1026, 1029-32 (9th Cir. 1991); Bacon v. Bunting, 534 F. Supp. 412, 415 (D. Md. 1982).

As mentioned, Muhs' complaint invokes the Court's diversity jurisdiction, and alternatively, the Court's admiralty jurisdiction. Dkt. No. 1 ¶¶ 9 & 10. Muhs did not identify any particular claims in his complaint as being admiralty claims under Rule 9(h). See Fed. R. Civ. P. 9(h) advisory committee's note (1966). Muhs did demand a jury

---

[2] The "saving to suitors" clause was a part of the original Judiciary Act of 1789, and is now codified at 28 U.S.C. § 1333(1).

10

trial.  Dkt. No. 1, Prayer ¶ 5.

On September 5, 2008, Muhs moved to amend his complaint
to add the following sentence:  "This case occurs upon the
navigable waters of the United States and as such, the
Federal Court has jurisdiction pursuant to Rule 9(h)."  Dkt.
No. 77 at 1.  Muhs did not seek to modify his complaint in
any other particular, and seeks to make this addition only
if there are "any issues as to the Complaint sounding in
admiralty[.]"  Id. at 2.  Muhs has not asked the Court to
withdraw diversity of citizenship as the primary basis for
jurisdiction in this case, as to any particular claim(s), or
in toto.

Plaintiff's motion to amend is vague and ineffective as
drafted and will be dismissed for those reasons.  It is not
clear what Muhs is attempting to accomplish through his
amendment.  If Plaintiff wishes to ensure that admiralty law
(and thus pure comparative negligence) applies to his
negligence claims, his original complaint and the facts
described by Plaintiff already require that maritime law
governs.  Diesel "Repower", 271 F.3d at 1322 & n.1.  If
Plaintiff is attempting to withdraw his demand for a jury
trial, and/or designate some or all of his claims as

11

admiralty claims under Rule 9(h), his proposed amendment does not state as much.

As discussed herein, the only viable claims remaining in this action are maritime tort claims, and there is an independent basis for jurisdiction under the diversity statute, 28 U.S.C. § 1332. Because Muhs has not withdrawn his demand for a jury trial unequivocally, or his invocation of § 1332 as the primary basis for the Court's power to hear the case, the Court will honor Plaintiff's jury demand in his original complaint.

## III. River Rats' Motion for Summary Judgment

A. Equal Knowledge

Four elements must be proven to recover for negligence: duty, breach of duty, causation, and damages. City of Douglasville v. Queen, 270 Ga. 770, 771 (1999). Muhs asserts that River Rats was negligent by failing to shut off the fuel pump and by permitting a customer to spill gasoline into his boat. Dkt. No. 1 ¶ 31.[3]

---

[3] In Muhs' opposition brief to River Rats' motion for summary judgment, he cited several regulations promulgated by the National Fire Protection Association for Marinas and Boatyards ("NFPA regulations") in support of his argument that River Rats was negligent. Thereafter, River Rats filed a motion in limine to exclude any reference to the NFPA regulations, which was granted by Magistrate Judge James E. Graham as

12

As to these claims, River Rats submits that it is entitled to judgment as a matter of law because Muhs had equal or superior knowledge of the danger. Muhs knew that gas had spilled into the boat, and except for Muhs' family, no one else was on the Nellie Belle or dock when he attempted to start the boat. As a result, River Rats maintains that Muhs' knowledge of the spilled gas prevents him from recovering against it.

As River Rats notes, there is no "failure to warn" liability in situations posing an open and obvious danger. "[N]o warning is required where the alleged obstruction, or condition is open and obvious to those in charge of the vessel's management or where those in control of the vessel have actual knowledge." Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 795 (5th Cir. 1977)(internal quotation marks

unopposed.   Plaintiff has not appealed from that order.   Under the Magistrate Judge's order

> [p]laintiff is precluded from introducing any NFPA regulation which: (1) was not in effect at the time of the accident; or (2) is inapplicable, i.e., the regulation does not cover the marina or the activities at issue in this lawsuit; or (3) has not been asserted in the pleadings of this lawsuit.

Dkt. No. 89.   Plaintiff did not cite to any NFPA regulation in his complaint.   Accordingly, the Court has not considered the regulations cited by Plaintiff in his opposition papers in ruling on River Rats' summary judgment motion.

13

AO 72A   ⊕
(Rev. 8/82)

omitted).[4]

Muhs had the pump turned on by Ms. Jones and he set the automatic lever on the pump. Dkt. No. 54, Muhs Dep. 102. There is no dispute that the fuel nozzle continued to dispense fuel absent "hands on" engagement. According to Muhs, River Rats' fuel nozzle had a latch-open device. Without this device, Plaintiff contends, the nozzle would have shut off, prevented the fuel overflow, and the fire.

Plaintiff insists that his conduct in starting the boat was not negligent. Chris Jones, the manager of Mudcat Charlie's, saw gas running down the side of the boat. Dkt. No. 62, Chris Jones Dep. 5. Jones told Muhs at about 4:45 p.m. not to start the boat for about an hour. Id. at 18. Muhs did not try to start the boat before 5:30 p.m., and at about 5:50 p.m., Mr. Jones entered the restaurant, and heard the boat explode. Id. at 6; Dkt. No. 72, Hugh Valentine Dep. 21. Muhs maintains that his actions were consistent with the instructions of Mr. Jones. Muhs also points out that he flushed the bilge with water, and left the bilge open to air out. Before Muhs started the boat, he did not smell gasoline

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

14

fumes. Plaintiff maintains that he did not have actual knowledge of, and did not appreciate, the risk.

"[T]he question of whether a risk is obvious or generally known is one of fact and thus should be decided by the trier of fact when reasonable minds may differ." Hodges v. Summer Fun Rentals, Inc., 203 Fed. App'x 89, 91 (9th Cir. 2006)(maritime negligent failure to warn)(quoting Maneely v. GMC, 108 F.3d 1176, 1179 (9th Cir. 1997)); see also Goodman v. City of Smyrna, 230 Ga. App. 630, 631-32 (1998) (assumption of the risk); Wilson Foods Corp. v. Turner, 218 Ga. App. 74, 75 (1995)(products liability).

Whether Muhs had equal or superior knowledge of the risk is a question of fact reserved for the jury under the facts presented here.

## B. Proximate Cause

According to River Rats, Muhs' act of starting the boat was the proximate cause of his injuries. The concepts of proximate cause and superceding cause apply in admiralty. That is, a plaintiff who is the superceding and proximate cause of his own injury cannot recover from a defendant tortfeasor whose conduct was a cause in fact of his injury.

15

Exxon Co. v. Sofec, Inc., 517 U.S. 830, 837-39 (1996). Under maritime law, to be a proximate cause, River Rats' breach must be "a substantial factor in bringing about the harm." Cornish v. Renaissance Hotel Operating Co., 8:06-CV-1722-T-27EAJ, 2007 U.S. Dist. LEXIS 95115, at *14-*15 (M.D. Fla. Dec. 28, 2007).

"What amounts to proximate cause is usually a jury question, except in plain, palpable and undisputable cases." Govea v. City of Norcross, 271 Ga. App. 36, 44 (2004). There is sufficient evidence in the record that would permit a reasonable factfinder to determine that Muhs acted reasonably to dissipate the risk that the boat would catch fire if started. E.g., Dkt. No. 62, Chris Jones Dep. 5-6 & 18-19. Muhs has presented some evidence that River Rats' acts or omissions caused Muhs' injuries. Muhs' acts were not the proximate cause of his own injuries as a matter of law.

## C. Contractual Waiver

River Rats has presented evidence that, before the accident, Muhs signed a Boat Storage Rental Agreement at the marina. The agreement provided:

> Landlord shall not be responsible for any injuries or damages resulting from, caused by or

16

growing out of Tenant's use of Landlord's dock or harbor facilities; and that Tenant hereby expressly releases and discharges Landlord from any and all liability from loss, injury, death, or damages to persons or property sustained by the presence upon or use of Landlord's facilities by Tenant or Tenant's guests . . . including . . . fire . . . or negligence[.]

Dkt. No. 51, Ex. A ¶ 5.

River Rats maintains that this agreement relieves it of liability in this case. In the Eleventh Circuit, an exculpatory clause purporting to limit liability is not enforceable under maritime law where it absolves a party of all liability for its own negligence. Moreover, to be enforceable, the language must be clear and unequivocal, and the parties must be of equal bargaining power to prevent overreaching. "The limitation [in an exculpatory clause] must not absolve the repairer of all liability and must still provide a deterrent to negligence." Diesel "Repower," Inc. v. Islander Invs. Ltd., 271 F.3d 1318, 1324 (11th Cir. 2001).

The persuasive authority relied on by River Rats, Sander v. Alexander Richardson Investments, looks upon such clauses more favorably. 334 F.3d 712 (8th Cir. 2003). Sander attempted to limit Diesel "Repower" to its facts in reaching its conclusion that "hold harmless" agreements in marina slip rental contracts are generally enforceable. Id. at 719. The

17

Court is not convinced that such a limitation is warranted or appropriate under governing precedent in this Circuit. The rule of Diesel "Repower" is phrased in broad terms, and does not provide any basis for the Court to limit its holding to ship repair contracts. Accordingly, because the clause at issue attempted to absolve River Rats of all liability for its own negligence, it is unenforceable.

## D. River Rats' Liability for Installing the Port Alternator

Muhs complains that River Rats "negligently placed, and/or allowed to remain in place, the non-marine alternator on the [port] engine." Dkt. No. 1 ¶ 31(a).[5] According to Muhs, though, either Reitz Marine Service or the proprietor of Two-Way Boatyard, Charles Johnson, did all the repairs and put the alternator on the boat.[6] Dkt. No. 54, Muhs Dep. 56. River Rats asserts that it leases property to Reitz Marine Service and Two-Way Boatyard, but that it is not responsible for any negligence of those businesses.

---

[5] Muhs' complaint actually refers to the starboard alternator, but after discovery, the only evidence of a defect related to the port alternator. Below, the Court explains that amendment of the complaint to cure this defect is appropriate.

[6] Muhs did not name Two-Way Boatyard as the responsible party, but his testimony suggested that Two-Way Boatyard was the entity that worked on the alternator, as described below.

AO 72A  ⊕
(Rev. 8/82)

Muhs has not asserted that Reitz or Johnson were agents of River Rats, or explained why River Rats has any responsibility for the allegedly defective port alternator. Because Muhs cannot prevail on this claim without evidence of some act of negligence by River Rats, River Rats is entitled to summary judgment on Muhs' claim that it was negligent in installing a defective alternator on the boat.

## IV. **Welch's Summary Judgment Motion**

Muhs' complaint posits that Welch is liable for providing an unseaworthy boat, and that Welch was negligent in placing, or allowing to remain in place, a defective alternator on the vessel. Welch and Muhs disagree about who owned the Nellie Belle at the time of the accident. Because Muhs' claims against Welch rest on the assumption that Welch owned the boat, the Court will explore the issue of ownership below as well.

## A. Seaworthiness

Litigation related to the warranty of seaworthiness is within the admiralty jurisdiction of the district court. Mahnich v. Southern S.S. Co., 321 U.S. 96, 98-99 (1944). A

AO 72A
(Rev. 8/82)

ship's owner has a nondelegable, strict duty to ensure that his vessel is "reasonably fit to be at sea" for the particular voyage undertaken. Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 441 (2001).

Yet, recovery under the doctrine of seaworthiness is available only to seamen or those doing seamen's work. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 629 (1959); Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 208 n.6 (1996). All others are owed only a duty of reasonable care under the circumstances. Kermarec, 358 U.S. at 632. Assuming, arguendo, that Welch was the owner of the vessel at the time of fire, Muhs' unseaworthiness claim fails because guests or invitees cannot recover on an unseaworthiness claim against the owner as a matter of law.

## B. Negligence Claim

According to Muhs' complaint, "Welch negligently placed, allowed to be placed, and/or allowed to remain in place, a non-marine alternator on the starboard engine." Dkt. No. 1 ¶ 13. Plaintiff further averred that "[t]he non-marine alternator lacked spark-suppressing screens." Id. ¶ 14.

20

i. Amendment of the Complaint under Rule 15(b)

Contrary to the averments of the complaint, it is beyond dispute that the starboard alternator was marine grade, and ignition-protected. Dkt. No. 45, Atherton Report at 2; Dkt. No. 59, Ex. C, Knox Aff. ¶ 3; Dkt. No. 59, Ex. D, Game Aff. ¶¶ 3-4. However, Welch concedes that Muhs' expert, Dr. John G. Atherton, found that the port alternator was not "ignition-protected," in that it did not have sufficient spark suppressing screens in the rear portion of that alternator. Atherton concluded that this defect would have allowed "flame propagation out of the alternator." Dkt. No. 45, Atherton Report at 3.

Nonetheless, Welch contends that Atherton's findings are irrelevant because Muhs did not allege a defect with the port alternator in his complaint. As River Rats has also argued, Welch insists that Muhs cannot pursue a claim based on a defect with the port alternator because his complaint stated that there was a defect with the starboard alternator.

The Federal Rules of Civil Procedure provide:

If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court

21

that the evidence would prejudice that party's
action or defense on the merits. The court may
grant a continuance to enable the objecting party
to meet the evidence.

Fed. R. Civ. P. 15(b)(1).

Although it is better practice for a plaintiff to move
to amend his complaint under Rule 15(a) when the evidence
developed during discovery does not conform to the pleadings,
the Court has the authority to amend the pleadings under Rule
15(b) where such an amendment is not offered. 6A Charles
Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal
Practice and Procedure § 1491 (2d ed. 1990). The Court is
empowered to do so to avoid the "tyranny of formalism" that
prevailed before the advent of the Federal Rules in 1938.
See Deere & Co. v. Johnson, 271 F.3d 613, 622 n.7 (5th Cir.
2001).

The function of Rule 15(b) is to allow cases to be
decided on the merits, rather than on the "pleading skills
of counsel[.]" 6A Wright, Miller, & Kane, Federal Practice
and Procedure § 1491. It is appropriate for the Court to
apply Rule 15(b) in connection with a pretrial motion. Brown
v. Hughes, 894 F.2d 1533, 1539 (11th Cir. 1990)(citing
Sherman v. Hallbauer, 455 F.2d 1236, 1242 (5th Cir. 1972));
Bobrick Corp. v. Am. Dispenser Co., 377 F.2d 334, 337 (9th

22

Cir. 1967).

The Court may apply Rule 15 to correct facts that were misstated in the pleadings. Chancery Clerk v. Wallace, 646 F.2d 151, 160-61 (5th Cir. Mar. 1981); NLRB v. Merrill, 388 F.2d 514, 518-19 (10th Cir. 1968). Such an amendment is proper where there is no showing of prejudice by the opposing party. E.g., Hodgson v. Colonnades, Inc., 472 F.2d 42, 48 (5th Cir. 1973).

Defendants have received actual notice of Plaintiff's contention that the port alternator was defective, rather than the starboard alternator, as set out in the complaint. Experts retained by Plaintiff and Defendants have had an opportunity to examine both alternators on the boat, and have reached varying conclusions regarding whether the port alternator was defective. Defendants have not claimed that they would be prejudiced by the introduction of evidence relating to the port alternator, or sought a continuance to prepare an adequate defense to meet this evidence. Id. at 48 n.10. Rather, Defendants seek only to gain a tactical advantage in the suit. Id. at 48.

This is not a case where the plaintiff is attempting to add a new party and transform his lawsuit into a case

23

involving a different legal theory of recovery.  <u>Faser v.</u>
<u>Sears, Roebuck & Co.</u>, 674 F.2d 856, 859-60 (11th Cir. 1982).
Amendment is proper under Rule 15(b)(1), and the Court will
consider whether there is a triable issue of fact regarding
the port alternator.

ii. Ownership of the Boat at the Time of the Accident[7]

In Count II of Plaintiff's complaint, Muhs averred that
he contracted for the purchase of the boat and that Welch
held the title to the boat.  In Count IX, Muhs alleged that
Welch owned the boat at the time of the injuries.  Welch
rejects Muhs' argument that Welch owned the <u>Nellie Belle</u>
because Muhs had not paid him the entire purchase price at
the time of the accident.

In 2003, Welch purchased a 1987 Carver Montego Cruiser,

---

[7] Defendants have noted that Muhs failed to file a response to the
statement of material facts submitted by Welch, in support of Welch's
summary judgment motion.  Defendants conclude that Welch's submissions
are "deemed admitted."  Dkt. No. 96 at 4.  As Defendants underscore,
this failure, and similar laxity with respect to the filing of the
stipulations with the pretrial order by Plaintiff, has engendered
unnecessary confusion regarding the stipulated facts.  <u>See</u> Dkt. Nos. 96,
93, & 83, Attach. A.  Nonetheless, the Court does not accept Defendants'
argument regarding the effect of Plaintiff's failure to submit a
response to Welch's statement of material facts.  Under Local Rule 56.1,
all facts offered by the moving party "will be deemed to be admitted
unless controverted by a statement served by the opposing party."
Although Muhs should have filed a response to the proposed statement of
material facts offered by Welch, Muhs' opposition brief does controvert
the facts asserted by Welch to some degree.  Most notably, Muhs contends
in his brief that Welch owned the boat.

24

a twenty-seven foot boat, through a broker from another individual, John Speaker. On April 16, 2005, Lamar Welch entered into an agreement to sell the boat to Muhs. The sales contract provided that Welch sold the boat to Muhs "with conditions," and that the agreement was "a conditional sales contract[.]" Dkt. No. 59, Ex. A. The total sales price was $17,000, and the agreement called for Muhs to pay at least $1,000 dollars a month until the balance was paid in full. At the time of the incident giving rise to this lawsuit, Muhs had paid Welch $12,000 or $12,500.

The contract provided that, until the balance was paid in full, the boat was to be

> maintained in a similar condition as now, with full insurance paid with seller, Lamar Welch, remaining as first mortgage holder on said insurance policy. Clear title to said boat is to be transferred to purchaser when payments are completed. . . . Slip rent fee is to be assumed at this date by purchaser, Gary Muhs, at approx. $200. per month. Insurance from April 2005, until March, 2006 has been paid by Seller, Lamar Welch, and will be reimbursed by purchaser. Seller will continue to help with minor maintenance of boat, such as pressure washer system etc. water lines, water pumps etc. as can be arranged when seller and purchaser can be present on location where boat is kept.

Dkt. No. 59, Ex. A.

Muhs contends that Welch maintained control over the

AO 72A
(Rev. 8/82)

boat, as evidenced by repair bills dated May 23, 2005.  Dkt.
No. 70, Ex. 4.  During Welch's deposition, he admitted that
he paid Two-Way Boatyard for a bill submitted to him on that
date for services rendered in cleaning the boat, checking it
for a leak on the starboard side, replacing the water pump,
and fixing a diver platform bracket.  Dkt. No. 94, Welch Dep.
25.  Muhs also notes that Welch came to inspect the boat
after it was run aground in May 2005.  Id. at 26.

Also, Muhs points out the Nellie Belle was registered in
Welch's name.  Dkt. No. 70, Ex. 2.  In Muhs' deposition, he
also highlighted the fact that Welch stated that he could
borrow the boat until the purchase price was paid in full.
Dkt. No. 54, Muhs Dep. 57.  Welch rejoins that, unlike
automobiles, there is no "title requirement" for boats under
Georgia law.  Dkt. No. 72, Ron Harris Dep. 139.  Instead,
boats are registered in the owner's name and the new owner
is responsible to re-register the boat in his name.

Georgia law provides that:

The owner of each vessel required to be numbered
by this article shall file an application for
number with the department on forms approved by
it.  Upon receipt of the application in approved
form, the department shall enter the application
upon its records and issue to the applicant a
certificate  of  number  stating  the  number
assigned to the vessel, the name and address of

26

the owner, and such additional information as
may be prescribed by the department.

Ga. Code Ann. § 52-7-5(a).

While this law provides that a purchaser of a boat in
Georgia is obliged to inform the state when he becomes the
owner of the boat for registration purposes, the statute does
not speak to when such an event, i.e., ownership, occurs.
The statute does not aid Welch in his argument that Muhs
owned the Nellie Belle at the time of the accident.

Muhs also notes that Welch paid for insurance on the
boat. Dkt. No. 70, Ex. 5. After the explosion, Welch filed
a claim for the boat with his insurer, Allstate, and received
a check for the same. But this fact is not determinative,
especially in light of the fact that Welch received the
balance of the unpaid sales price from Allstate, not the full
value of the boat. Dkt. No. 94, Welch Dep. 29.

Additionally, Muhs contends that the boat was left in a
slip Welch rented from the marina. Dkt. No. 70, Ex. 3 & Dkt.
No. 94, Welch Dep. 23. Nevertheless, this fact does not
support Muhs' position, given that the obligation had been
assumed by Muhs as of June 1, 2005. Dkt. No. 51, Ex. A.

Welch urges that Muhs is bound by a previous judicial
admission that he owned the boat. In a previously filed and

27

voluntarily dismissed action that Muhs brought against Welch in the Superior Court of Henry County, Georgia, Muhs alleged that Welch sold him the boat, and Welch admitted this contention. Dkt. No. 59, Ex. B ¶ 3. Welch contends that this qualifies as a judicial admission, and establishes that Muhs owned the boat.

The Court disagrees. "A party's pleading in one case may generally be used as an evidentiary admission in other litigation." McCormick on Evidence § 257 at p. 186 (6th ed. 2006). "Evidentiary admissions are to be distinguished from judicial admissions. . . . [A]n evidentiary admission is not conclusive but is subject to contradiction or explanation." Id. § 254 at p. 180-81; see also King v. Shepard & Co., 105 Ga. 473, 473 (1898). The pleading in the Henry County case constitutes an evidentiary admission, but not a judicial admission.

In general, a person who has one or more interests in an object may be referred to as its owner. Restatement Property § 10 (1936). The meaning of ownership "depends upon the subject-matter and the circumstances surrounding the subject-matter and the parties." Bare v. Cole, 260 N.W. 338, 340 (Iowa 1935).

"Ownership of chattels usually draws to it the right of possession." Ill. Sewing Mach. Co. v. Harrison, 96 P. 177, 177 (Colo. 1908)(quoting Wells on Replevin § 39 (2d ed.)). Also, the right to use, control, and occupancy signifies ownership. People ex rel. Hart v. Vill. of Lombard, 149 N.E. 584, 585 (Ill. 1925). The word "owner" may be applied to more than one person in regard to the same property at the same time; one being regarded as the owner for a certain purpose, and another for a different purpose. Hardin v. Chattanooga S. R.R. Co., 113 Ga. 357, 359 (1901); Good v. Jarrard, 76 S.E. 698, 701 (S.C. 1912).

In Hardin, the Georgia Supreme Court found that one who was in possession of, and who had paid part of the purchase price for, a piece of real property was not the owner of the land, "since his claim thereto must necessarily be based upon a contract which in terms provides that he shall not become the owner until he complies with his obligation to pay for the property." 113 Ga. at 360-61.

In this case, there is no evidence that either man had an exclusive right to possess, use, control, or occupy the boat. It is beyond dispute that Muhs had an interest in the boat. Welch concedes that Muhs had not paid Welch the full

29

purchase price for the boat. Until Muhs did so, Welch also had an interest in the boat. Based on the evidence presented here, particularly the language of the conditional sales contract, and the parties' subsequent conduct, Welch had an ownership interest in the vessel sufficient to hold him liable for any negligence.

iii. Evidence That Welch Had Knowledge of the Defective Character of the Port Alternator at the Time of the Accident

Muhs contends that Welch was negligent by owning a boat without a spark arrester on the port alternator, and allowing Muhs to use the boat in this condition. Plaintiff's expert, Atherton, has stated that the port alternator was defective and dangerous. Dkt. No. 45 at 3-4. According to Atherton's supplemental report, there was a lack of sealing around the terminal post of the port alternator. Atherton stated that this defect would allow a flammable vapor to escape from the engine compartment and pass into the alternator, and that "[i]ncendive electrical activity at these brushes and slip rings would be capable of causing ignition[.]" Dkt. No. 70, Ex. 9 at 4.

Welch retained Stephen A. Knox as a professional

engineer and a marine surveyor. In contrast to Atherton, Knox testified that, based on his inspection and disassembly of the alternators in February and April 2008, both alternators were ignition-protected. Dkt. No. 59, Ex. C, Knox Aff. ¶¶ 2-3. Welch's other expert, E. Charles Game, offered an affidavit that also stated that both alternators were ignition-protected. Dkt. No. 59, Ex. D, Game Aff. ¶¶ 3-4.

Based on the expert evidence submitted, there is some evidence that the port alternator was defective. Nonetheless, Welch insists that, during the two years he owned the boat, he had maintenance work done, but none to the engines or alternators.[8]

During Muhs' deposition, he testified that there was a non-marine alternator on the boat. Dkt. No. 54, Muhs Dep. 55-56. When asked by Defendants' counsel whether Muhs knew if the non-marine alternator was installed while Welch owned the boat, Muhs stated that he "knew it didn't work and then

---

[8] In the proposed pretrial order, Plaintiff cited to a provision in the Code of Federal Regulations that requires boat manufacturers to provide for "ignition protection" in certain circumstances. Dkt. No. 83 at 17. This Coast Guard regulation is codified at 33 C.F.R. § 183.410, and requires that electrical components must not ignite a flammable mixture of gas and air when the device is in operation. Because this regulation places a duty on original manufacturers, not subsequent individual owners, it is irrelevant to Welch's liability in this case.

we went to the boat and it did." Id. at 56. Muhs further testified that "it was the guy that repair[ed] the bottom of the hull that made the determination that it was a bad alternator." Id.

Thereafter, Muhs was asked: "So you don't have any firsthand knowledge, though, whether Tim Reitz put it on there or not but you believe it was him?" Muhs answered "[t]hat's accurate." Dkt. No. 54, Muhs Dep. 56-57. Muhs testified that the alternator problem was remedied not long before the incident on June 22, 2005, because the alternator was not working several days before then when Muhs had the Nellie Belle out and became stranded on the river. Id. Yet, Muhs admitted that he knew of no repair records documenting the same. Id. at 92.

Muhs testified that Welch "knew that there was a problem with the alternator, so I -- with the understanding that he wasn't going to get paid until it was repaired, it would be reasonable for me to believe that he had an alternator replaced on the boat in one of the motors." Id. at 108.

According to Welch's deposition and repair records, the "bottom job" repairs were done by Charlie Johnson at Two-Way Boatyard in March 2003 and May 2005. Dkt. No. 94, Welch Dep.

AO 72A ⊕
(Rev. 8/82)

25-29 & Exs. 2 & 4. During Welch's deposition, the following exchange occurred with Muhs' attorney:

Q. And did you ever know that the -- one of the engines did not have a marine grade alternator?
A. No sir.
Q. When did you first find that out?
A. When I saw the report from either the fire department or the DNR. . . .
Q. What is the purpose of a marine grade alternator?
A. It's supposed to suppress spark, any spark that might occur during its operation.
Q. Why?
A. To prevent a fire.

Dkt. No. 94, Welch Dep. 27.

Welch also testified that the non-marine grade alternator was on the boat when he bought it. Id. at 40. During Welch's deposition, he was questioned about an undated and unaddressed repair bill that involved work on the port engine and related components. Welch testified that the repair bill was found on the boat when he bought it, and that the work had been done by a previous owner. Id. at 28 & Ex. 3.

The owner of a vessel owes to every person lawfully on board by express or implied invitation in the transaction of proper business a general duty to provide reasonable security against danger to life and limb, and to exercise ordinary care to protect him from injury, and is answerable for any injury suffered by such person on account of the breach of that duty by himself. . . .

70 Am. Jur. 2d Shipping §§ 375 (2008); Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632 (1959); see also Romualdo P. Eclavea, Liability of Owner or Operator of Pleasure Boat for Injury or Death of Guest Passenger, 35 A.L.R. 4th 104 § 10 (1985); H. C. Lind, Liability of Owner or Operator of Motorboat for Injury or Damage, 63 A.L.R. 2d 343 §§ 3[d] & 17 (1959).

Welch had a duty to warn Muhs of the defective alternator, if he knew about its condition. If Welch did have the alternator repaired, he owed a duty to Muhs to take reasonable care in making the repair. E.g., Kale v. Daugherty, 174 S.E.2d 846, 848-49 (N.C. Ct. App. 1970).

There is circumstantial evidence that Welch knew about the defective character of the alternator before the fire took place. There is also indirect evidence that Welch may have had the alternator on the port engine replaced with a defective alternator, or that Welch may have had the alternator repaired in a defective manner by Reitz or Johnson. While the evidence does not establish liability conclusively, it is sufficient to withstand a motion for summary judgment. If the jury credits this evidence and finds that Welch had knowledge of the defective character of

34

the alternator, Welch may be liable for negligence.

## V. Two-Way Boatyard's Motion for Summary Judgment

In Muhs' complaint, he states that Two-Way Boatyard was negligent by (1) placing a non-marine alternator on the boat's engine, (2) failing to shut off the fuel pump, and (3) allowing a customer to spill gasoline into a boat. Dkt. No. 1 ¶¶ 31 & 38.

Two-Way Boatyard contends that there is no evidence that it installed or worked on the alternator. In Muhs' deposition, he contended that Reitz did so. Dkt. No. 54, Muhs Dep. 56. During Welch's deposition, he testified that Two-Way Boatyard performed maintenance on the boat, and that Reitz worked on it a time or two. Dkt. No. 94, Welch Dep. 20. Muhs also testified that the individual who repaired the bottom of the boat identified the "bad alternator" and worked on it for Welch. Dkt. No. 54, Muhs Dep. 56. Welch testified that the "bottom job" repairs were done by Two-Way Boatyard. Dkt. No. 94, Welch Dep. 25-29. The repair records for the boat are consistent with this testimony. Id. Exs. 2 & 4.

Although Muhs has not responded to the motion for summary judgment filed by Two-Way Boatyard, "the district

35

court cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion." United States v. One Piece of Real Property, 363 F.3d 1099, 1101 (11th Cir. 2004).

Because there is some circumstantial evidence of negligence by Two-Way Boatyard, summary judgment is not warranted in its favor as to Muhs' claim regarding the port alternator. Because there is no evidence that Two-Way Boatyard had any involvement with the gasoline overflow, Two-Way Boatyard is entitled to summary judgment as to those allegations.

## VI. Smith's Motion for Summary Judgment

Muhs seeks to pierce the corporate veil to proceed against Smith, based on the notion that Smith is the alter ego of the corporate defendants in this case, making him liable for their negligence. Dkt. No. 1 ¶¶ 41-42.

In Smith's summary judgment motion, he states that he is the sole shareholder of River Rats, Incorporated, which operates Two-Way Marina and Mudcat Charlie's restaurant. Smith reports that he does not own Two-Way Boatyard. Rather, according to Smith, Charles Johnson, Jr., owns Two-Way

36

Boatyard, and Two-Way Boatyard leases property at Two-Way Marina. Smith asserts that there is no evidence that he disregarded or abused the corporate form of River Rats.

Under Georgia law, individual shareholders and officers of a corporation are "shielded by the corporate veil, in the absence of fraud or abuse of the corporate form." <u>Dearth v. Collins</u>, 441 F.3d 931, 935 (11th Cir. 2006).

To establish liability under the alter ego doctrine, Plaintiff must demonstrate:

> (1) that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; (2) that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and (3) to adhere to the doctrine of corporate entity would promote injustice or protect fraud.

<u>Id.</u>

Muhs has not responded to Smith's summary judgment motion. On a motion for summary judgment (where the non-moving party bears the burden of proof), if a movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary

37

deficiency." <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1116-17 (11th Cir. 1993).

Because Plaintiff has failed to offer any evidence in support of this claim, Smith urges that summary judgment is proper in his favor.

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, <u>if appropriate</u>, be entered against that party.

Fed. R. Civ. P. 56(e)(2) (emphasis added).

"[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995).

Because Muhs has failed to cite to any evidence showing that Smith is liable personally, summary judgment is proper in Smith's favor.


## VII. Punitive Damages

In addition to Muhs' contentions of negligence relating to the port alternator, Muhs also avers that it is proper to

38

impose punitive damages against all Defendants for placement, or failure to remove, the improper alternator without a spark arrester.

As Defendants note, even gross negligence is insufficient to warrant punitive damages. Bartja v. Nat'l Union Fire Ins. Co., 218 Ga. App. 815, 818 (1995). Rather, Plaintiff must demonstrate "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Ga. Code Ann. § 51-12-5.1(b). Welch submits that there is no evidence that he acted wilfully by installing, or failing to remove, a defective alternator.

Muhs has not responded with any evidence that would justify imposing punitive damages. Because Muhs has pointed to no evidence showing willful misconduct or recklessness, his claim for punitive damages fails as a matter of law.

## CONCLUSION

For the reasons explained above, the motions for summary judgment filed by River Rats and Welch are **GRANTED** in part, and **DENIED** in part. Dkt. Nos. 51 & 59. Smith's motion for summary judgment is **GRANTED**. Dkt. No. 52. Because Two-Way

AO 72A
(Rev. 8/82)

Marina is entitled to summary judgment, but Two-Way Boatyard is not (at least as to the contention relating to the port alternator), their motion is **GRANTED** in part, and **DENIED** in part. Dkt. No. 53. Muhs' motion to amend his complaint is **DISMISSED**. Dkt. No. 77.

**SO ORDERED**, this ___18th___ day of November, 2008.

JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)